# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-2723

_____

Jerry M. Bass; Bonnie Bass,          *
                                     *
              Appellees,             *
                                     *    Appeal from the United States
       v.                            *    District Court for the
                                     *    Western District of Missouri.
General Motors Corporation,          *
                                     *
              Appellant.             *

_____

Submitted:  February 12, 1998

Filed:  July 24, 1998

_____

Before WOLLMAN and HANSEN, Circuit Judges, and DAVIS,[1] District Judge.

_____

WOLLMAN, Circuit Judge.

General Motors Corporation appeals from the judgment entered by the district court[2] on the jury verdict in favor of Jerry M. Bass and Bonnie Bass on their claim of strict product liability.  General Motors contends that the district court erred in denying

_____

[1]The HONORABLE MICHAEL J. DAVIS, United States District Judge for the District of Minnesota, sitting by designation.

[2]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

its alternative motions for judgment as a matter of law or for a new trial. General Motors also contends that the court erred in refusing to dismiss this action with prejudice as a sanction for the Basses' failure to preserve relevant evidence. Because the record contains sufficient evidence to support the jury's verdict, and because we find no abuse of discretion in the district court's ruling on sanctions, we affirm.

## I.

On June 10, 1986, Jerry Bass was returning to his home in Columbia, Missouri, in his wife's 1986 Oldsmobile Cutlass Ciera when he observed an approaching Dodge sedan in the opposing lane. The driver of the Dodge seemed to lose control of the vehicle, and it swerved across the road into the oncoming lane, colliding with Bass's vehicle and causing the Ciera to strike a third vehicle parked on the side of the street. Bass was thrown forward into the windshield, striking his head and leaving a jagged "starburst" imprint on the glass. He suffered a closed head injury, resulting in permanent damage to the brain. The driver of the Dodge, a young male, fled the scene of the accident on foot and was never identified or apprehended by police.[3]

The Basses originally filed this action in the circuit court of Jackson County, Missouri. The suit was voluntarily dismissed and subsequently refiled in district court. The Basses prosecuted the case on the theory that the seatbelt system in the Ciera was designed with a dangerous structural defect. The seatbelt system incorporated what General Motors termed a "window shade comfort feature,"[4] a device that permitted the

---

[3]At the scene of the accident, Bass was initially assisted by Sylvester Tart, a witness to the collision. Tart unbuckled Bass's seatbelt and helped Bass from the car. Tart later learned that the Dodge sedan that caused the accident was owned by his sister, from whom it had been recently stolen.

[4]This industry term refers to the method by which the tension in the shoulder strap of the seatbelt can be released. As explained by plaintiffs' expert witness:

retractor spring to be compromised, eliminating the constant tension that would otherwise exist, and allowing for excessive slack to develop in the shoulder strap of the driver's seatbelt. According to the Basses' theory, when excessive slack is allowed to develop, the seatbelt becomes too loose to restrain the driver properly, resulting in diminished protection and a greater risk of serious injury in the event of an accident. The Basses contended that this alleged design defect caused or enhanced the injuries Jerry Bass suffered in the accident. They sought to hold General Motors liable for those injuries under theories of negligence and strict product liability.[5]

After the district court resolved a dispute involving sanctions, the details of which are set forth later in this opinion, the case proceeded to trial. At the close of plaintiffs' case, General Motors moved for judgment as a matter of law, which the court denied. The court denied a similar motion by General Motors at the close of all evidence, but did rule that the Basses could not submit a claim for punitive damages to the jury. The jury returned a verdict in favor of General Motors on the negligence claim and in favor of the Basses on their strict product liability claim, awarding $1,170,000 to Jerry Bass for his injuries and $75,000 to Bonnie Bass for loss of consortium. The court entered judgment on the verdicts, denying a renewed motion by General Motors for judgment as a matter of law or, alternatively, a new trial.

---

> [T]he industry calls it a window shade because the means by which the belt is locked up is similar to what we have in a roll-up window shade in a home where you pull it down slowly and give a little jerk at the bottom and it locks at that point. And then if we want to unlock it, we just pull it down a little bit, it releases and you can roll it up.

Trial Transcript, Vol. IV at 598.

[5]The Basses additionally sought to assign liability to General Motors premised upon its failure to equip the Ciera with a driver's side airbag system. The court granted summary judgment on that claim, holding that it was barred by the applicable statute of limitations.

## II.

We review a motion for judgment as a matter of law de novo, applying the same standard as that employed by the district court. See Manning v. Metropolitan Life Ins. Co., Inc., 127 F.3d 686, 689 (8th Cir. 1997). A post-verdict motion for judgment as a matter of law requires the court to determine whether the record contains sufficient evidence to support the jury's verdict. See McKnight v. Johnson Controls, Inc., 36 F.3d 1396, 1400 (8th Cir. 1994). "In determining whether a plaintiff has made a submissible case, we must examine the sufficiency of the evidence in the light most favorable to the plaintiff and view all inferences in his or her favor." Pree v. Brunswick Corp., 983 F.2d 863, 866 (8th Cir. 1993). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is 'susceptible of no reasonable inference sustaining the position of the nonmoving party.'" McKnight, 36 F.3d at 1400 (quoting White v. Pence, 961 F.2d 776, 779 (8th Cir. 1992)).

The denial of motion for a new trial under Fed. R. Civ. P. 59(a) is reviewed with great deference to the district court's ruling and will not be reversed in the absence of a clear abuse of discretion. See McKnight, 36 F.3d at 1400. "The key question is whether a new trial should have been granted to avoid a miscarriage of justice." Id.

General Motors claims that the Basses failed to establish a submissible claim for strict product liability based on the theory variously known as "enhanced injury," "second collision," or "crashworthiness" liability. As we explained in Polk v. Ford Motor Co.:

> The second collision doctrine, enhanced injury doctrine, or defect-enhancing doctrine, as it is variously called, is the legal concept which imposes liability based on the construction or design of a product which causes enhanced or greater injuries in the course of or following an initial accident or collision brought about by some independent cause.

529 F.2d 259, 264 (8th Cir. 1976) (en banc); see also Hofer v. Mack Trucks, Inc., 981 F.2d 377, 383 (8th Cir. 1992).

This doctrine has its roots in Larsen v. General Motors Corp., 391 F.2d 495 (8th Cir. 1968), in which we held that an automobile manufacturer "is under a duty to use reasonable care in the design of its vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of a collision." Id. at 502. In explaining the potential liabilities of an automobile manufacturer that failed to exercise reasonable care in the design and construction of a vehicle, we stated:

> Any design defect not causing the accident would not subject the manufacturer to liability for the entire damage, but the manufacturer should be liable for that portion of the damage or injury caused by the defective design over and above the damage or injury that probably would have occurred as a result of the impact or collision absent the defective design.

Id. at 503 (emphasis supplied).

Since Larsen, two competing frameworks have emerged. In Huddell v. Levin, 537 F.2d 726 (3d Cir. 1976), the Third Circuit explained that in an enhanced injury or crashworthy case a plaintiff must prove: (1) that a practicable alternative, safer design existed; (2) what injuries, if any, would have resulted if the alternative, safer design had been used; and (3) some method of establishing the extent of enhanced injuries attributable to the defective design. See id. at 737-38. The court rejected the idea that a manufacturer might be liable for the totality of a plaintiff's injuries if those injuries were deemed indivisible: "We simply do not accept the proposition that suing for wrongful death suffices to convert limited, second collision, enhanced injuries liability into plenary liability for the entire consequences of an accident which the automobile manufacturer played no part in precipitating." Id. at 739.

-5-

The second approach is reflected in <u>Mitchell v. Volkswagenwerk, AG</u>, 669 F.2d 1199 (8th Cir. 1982), in which we predicted that in an enhanced injury liability case involving an indivisible injury, the Minnesota courts would reject the rationale of <u>Huddell</u>, <u>see</u> <u>id.</u> at 1207-08, as well as the notion that an injured victim should have the burden of proving the injuries he probably would have suffered in an accident absent the alleged defect:

> Thus we conclude that under Minnesota law the plaintiffs' burden of proof should be deemed satisfied against the manufacturer if it is shown that the design defect was a substantial factor in producing damages over and above those which were probably caused as a result of the original impact or collision. Furthermore, the extent of the manufacturer's liability depends upon whether or not the injuries involved are divisible such that the injuries can be clearly separated and attributed either to the manufacturer or the original tortfeasor. If the manufacturer's negligence is found to be a substantial factor in causing an indivisible injury such as paraplegia, death, etc., then absent a reasonable basis to determine which wrongdoer actually caused the harm, the defendants should be treated as joint and several tortfeasors.

<u>Id.</u> at 1206.

General Motors contends that the standard of proof for enhanced injury or second collision liability articulated in <u>Larsen</u> was not met because the Basses failed to prove the extent to which, if at all, any alleged defect in the Ciera's seatbelt system enhanced the injuries that Jerry Bass would have otherwise suffered as a result of the accident. General Motors further maintains that it can be held liable only for those enhanced injuries proven to have been caused by the alleged defect, rather than Bass's injuries as a whole.

Missouri law controls in this diversity action. <u>See</u> <u>American Eagle Ins. Co. v. Thompson</u>, 85 F.3d 327, 330 (8th Cir. 1996). We review the district court's

-6-

interpretation of Missouri law de novo. See Salve Regina College v. Russell, 499 U.S. 225, 231-32 (1991). In resolving any substantive issues of state law, we are bound by the decisions of the Missouri Supreme Court. See Kovarik v. American Family Ins. Group, 108 F.3d 962, 964 (8th Cir. 1997); Adams v. Fuqua Indus., Inc., 820 F.2d 271, 278 (8th Cir. 1987) ("We look to the highest court of the state as the final authority on state law"). If the Missouri Supreme Court has not spoken on a particular issue, "we may consider relevant state precedent, analogous decisions, considered dicta, . . . and any other reliable data." Kovarik, 108 F.3d at 964 (quoting Ventura v. Titan Sports, Inc., 65 F.3d 725, 729 (8th Cir. 1995)).

## III.

The Missouri Supreme Court has adopted the view of strict liability set forth in Restatement (Second) of Torts § 402A (1965). See Pree, 983 F.2d at 865; Keener v. Dayton Elec. Mfg. Co., 445 S.W.2d 362, 364 (Mo. 1969). This doctrine applies in defective design cases. See Pree, 983 F.2d at 865; Nesselrode v. Executive Beechcraft, Inc., 707 S.W.2d 371, 375 (Mo. 1986) (en banc); Blevins v. Cushman Motors, 551 S.W.2d 602, 606 (Mo. 1977) (en banc). Such liability imposes a duty upon a manufacturer not to introduce an unreasonably dangerous product into commerce, whether the danger arises from defective manufacture, defective design, or a failure to warn of danger. See Magnuson by Mabe v. Kelsey-Hayes Co., 844 S.W.2d 448, 455 (Mo. Ct. App. 1992); Peters v. Johnson & Johnson Prod., Inc., 783 S.W.2d 442, 444 (Mo. Ct. App. 1990).

To prevail under a strict liability theory in a defective design case, plaintiffs must prove four elements: (1) the product was sold in the course of the defendant's business; (2) at that time, the product was in a defective condition unreasonably dangerous when put to a reasonably anticipated use; (3) the product was put to use in a reasonably anticipated manner; and (4) the plaintiff was damaged as a direct result of a defective condition which existed at the time the product was sold. See Pree, 983 F.2d at 865;

Mulligan v. Truman Med. Ctr., 950 S.W.2d 576, 579 (Mo. Ct. App. 1997); Fahy v. Dresser Indus., Inc., 740 S.W.2d 635, 637-38 (Mo. 1987) (en banc); Mo. Ann Stat. §§ 537.760 et seq. (West 1988).  It is the last of these elements with respect to which General Motors challenges the sufficiency of the evidence regarding causation and damages.

In Polk, we predicted that the Missouri courts would recognize the concept of enhanced injury or second collision liability.  We stated a view consistent with our decision in Larsen:

> The appellees observe correctly that the negligent driver of the other car was a joint tortfeasor with Ford in respect to the enhanced injuries since there was no sufficient intervening cause to limit the driver's liability.  On the other hand, Ford was not a joint tortfeasor in respect to any damages occurring prior to the fire; it is only the *enhanced* injuries for which Ford may be held liable in this case.  Larsen v. General Motors Corp., supra, 391 F.2d at 503; see Passwaters v. General Motors Corp., 454 F.2d 1270, 1273-74 (8th Cir. 1972).

Polk, 529 F.2d at 268.

The enhanced injury/second collision doctrine was subsequently adopted by the Missouri Court of Appeals in Cryts v. Ford Motor Co., 571 S.W.2d 683, 687 (Mo. Ct. App. 1978).  "The second collision doctrine merely extends the scope of liability of a manufacturer to the situations in which the construction or design of its product has caused separate or enhanced injuries in the course of an initial accident brought about by an independent cause."  Id.  The court set forth the elements to be proved in an enhanced injury or second collision case:

> To recover under the second collision doctrine, the plaintiff has the burden of proving that the product was defective in condition or design

when it left the hands of the manufacturer. To establish that the product was defective, plaintiff must show that he was injured while using the product in its intended manner. Further, the plaintiff has the burden of proving that the product was unreasonably dangerous; i.e., the product must be dangerous to an extent beyond that which would be contemplated by the user with ordinary knowledge common to the community as to its characteristics. If there is evidence from which a jury could find that an unreasonably dangerous condition existed and that the defect caused the injury, the evidence is sufficient to support a jury verdict against the manufacturer.

Id. at 688 (internal citations omitted).

Cryts focused on the elements of proof regarding the alleged defective design and did not discuss the burden of proof to be utilized in apportioning liability for injuries between the tortfeasor whose negligence caused the accident and the manufacturer of the defective product. The latter issue was addressed in Richardson v. Volkswagenwerk, A.G., 552 F. Supp. 73 (W.D. Mo. 1982). Basing its view of Missouri law on the Missouri Supreme Court's decisions in Glick v. Ballentine Produce, Inc., 396 S.W.2d 609 (Mo. 1965) and Barlow v. Thornhill, 537 S.W.2d 412 (Mo. 1976) (en banc), the court held "that a strict liability defendant in a second collision case is to be held jointly and severally liable as a concurrent tortfeasor whenever the jury finds that the defendant's defective product was a substantial factor in producing an indivisible injury to the plaintiff." Richardson, 552 F. Supp. at 81. Summarizing the burden of proof it would apply, the court stated:

[T]his Court concludes that a plaintiff's burden of proof in a second collision-strict liability case should be deemed satisfied against the manufacturer if it is shown that the defective product was a substantial factor, rather than the sole factor, in producing damages over and above those which were probably caused as a result of the original collision. Furthermore, the extent of the manufacturer's liability depends upon whether or not the injuries involved are divisible such that the injuries can

be clearly separated and attributed either to the manufacturer or the original tortfeasor.  If the manufacturer's conduct is found to be a substantial factor in causing an indivisible injury such as paraplegia, quadriplegia, death, etc., then absent a reasonable basis to determine which wrongdoer actually caused the harm, the defendants are jointly and severally liable for plaintiff's total injuries.

Id. at 83.

In McDowell v. Kawasaki Motors Corp. USA, 799 S.W.2d 854 (Mo. Ct. App. 1990), the Missouri Court of Appeals rejected Huddell and cited Richardson with approval:

To make a submissible case, the plaintiff need not prove with specificity those injuries actually caused by the negligence of the original tort-feasor and those caused by the specific defects in the product.  The [Richardson] court stated that a strict liability defendant may be held "jointly and severally liable as a concurrent tort-feasor whenever the jury finds that the defendant's defective product was a substantial factor [rather than the sole cause] in producing an indivisible injury to the plaintiff."  Richardson, 552 F. Supp. at 81.  It was adequate in this case for plaintiffs to show that the fairing bracket was a substantial factor in producing the severe injury to James McDowell's leg.  Plaintiffs made a submissible case and the trial court did not err when it so held.

799 S.W.2d at 867.

To the extent that its decisions have not already done so, we conclude that if presented with the question, the Missouri Supreme Court would adopt the standard of proof set forth in Richardson and McDowell by holding that a plaintiff in an enhanced injury or second collision case involving an allegedly defective product need not prove with specificity the injuries that flowed directly from the defect.  Rather, the plaintiff has the burden of proving that the defect was a substantial factor in producing damages

-10-

over and above those which were probably caused as a result of the original impact or collision.

## IV.

The Basses submitted the testimony of several witnesses on the issue of the existence, extent, and cause of Jerry Bass's injuries. A physician/physiatrist and a neuropsychologist testified that the damage to Jerry Bass's brain and the symptoms of that damage were the result of the closed head injury he received when his head struck the windshield of the Ciera.

The Basses' principal witness on the issue of causation was H. Boulter Kelsey, Jr., an adjunct professor of mechanical engineering at Washington University in St. Louis and consulting engineer. Kelsey first testified generally regarding the physics of the forces that impact upon the driver of an automobile involved in a head-on collision. He described in extensive detail the increased force of impact the driver suffers when excessive slack exists in the seatbelt:

> Q:  . . . Is excessive slack or any slack ever desirable in a seat belt design?
>
> A:  No, sir, slack is not desirable. . . . There's no such thing as an adequate right amount of slack. The problem with slack is that when you have a slack belt, you have the body moving forward, accelerating, and then hitting the belt, so now we have added impact loading to the body from the belt itself, which is not present if there is no slack. . . . But as we go from that standard towards what we do in passenger cars, the less slack we can have the better the system will function in terms of containing the body and keeping it from moving into impact loading with something including the belt itself.

Tr. Vol. IV at 579-80.  And later:

    A:    The inclusion of a tension relief for comfort allows slack to be generated in the system.  Any slack is bad.  The greater the slack the worse it becomes.  So the corollary or the actual thrust of that is if we design a system to eliminate the slack, then we have got a much more efficient safer seat belt system that will provide for the energy attenuation and reduction of injury to people in relatively low-speed collisions.  Obviously if you hit a bridge abutment at 100 miles an hour it's not going to make a whole lot of difference in that circumstance.  But if we have a relatively low-speed crash, the kind that happen all the time, the belt system will do a much better job protecting somebody if it is snug against the body at all times.

Tr. Vol. IV at 585-86.  And finally:

    Q:    If you were subjected to an emergency situation, what would occur with that amount of slack that you just saw in the design?

    . . . .

    A:    The shoulder harness would have lost virtually all of its effectiveness.  I had a loop that I could hold out here about eight inches in front of my chest instead of having a loop against my body.  I wouldn't say that it brings the shoulder harness effectiveness down to zero, but it very significantly reduced its ability to distribute the motion of the upper torso, and <u>more injury will be the result</u>.  Depending on what the velocity of the crash is, how hard and heavy a crash it is, you'll have more gross movement of the body than you would with the belt snug against it.

Tr. Vol. IV at 613-14 (emphasis supplied).  According to Kelsey, then, because the Ciera's comfort feature allowed for excessive slack to be introduced in the shoulder

strap of the seatbelt, it constituted an unreasonably dangerous design defect capable of significantly enhancing any injuries suffered by a driver when an accident occurs. See Tr. Vol. IV at 583-84.

Next, Kelsey testified that, in his opinion, without the slack introduced in the seatbelt by the comfort feature, Bass likely would not have struck the windshield at all:

A:      It's my opinion that the excessive slack generated by the window shade comfort feature allowed Jerry Bass' upper torso to move forward far enough in this accident to strike the windshield, and had he had a snugly fitting shoulder belt, at the speed of this crash, I doubt that it would be possible for him to get near the windshield and have a head strike on the windshield.

Tr. Vol. IV at 610.  In Kelsey's opinion, the event that directly resulted in the injury to Bass's brain would not have occurred in the absence of the defective design that he described:

Q:      Would that have eliminated this whole issue of excessive slack?

A:      Yes, sir.

. . . .

Q:      Would it have eliminated this incident?

A:      Yes, sir, I believe so.

Tr. Vol. IV at 693.

On cross-examination, Kelsey conceded the possibility that even if the seatbelt system had met the standards he identified, Bass might have hit his head on the steering

-13-

wheel rather than on the windshield. Kelsey steadfastly maintained, however, that the force of any impact, and thus the severity of any injury, would likely have been greatly reduced if the design defect that allowed excessive slack to develop had not been present and Bass had been properly protected and restrained.

Under Missouri law, "absolute certainty of causation is not required in a product liability case and . . . 'probative facts' established by circumstantial evidence and pointing to the desired conclusion with enough certainty to be reasonable and probable is sufficient." Duke v. Gulf & Western Mfg. Co., 660 S.W.2d 404, 410 n.3 (Mo. Ct. App. 1983) (citing Lifritz v. Sears, Roebuck & Co., 472 S.W.2d 28, 32-33 (Mo. Ct. App. 1971)); see also Miller v. Varity Corp., 922 S.W.2d 821, 826-27 (Mo. Ct. App. 1996) (causal connection established when plaintiff shows that absent the alleged wrongful act, injury would not have been sustained); Klein v. General Elec. Co., 714 S.W.2d 896, 900 (Mo. Ct. App. 1986) (testimony of expert that product defect was probable cause of incident may constitute substantial evidence); Asbridge v. General Motors Corp., 797 S.W.2d 775, 779 (Mo. Ct. App. 1990) ("The jury was free to believe the opinions of plaintiff's expert on defect, unreasonable danger and causation"); Sanders v. Wallace, 817 S.W.2d 511, 515 (Mo. Ct. App. 1991) (plaintiffs satisfy burden of proof on causation by showing that injury is natural and probable consequence of negligent act or omission).

When viewed in the light most favorable to the Basses and giving them "the benefit of all reasonable favorable inferences and disregarding defendant's evidence except insofar as it may aid the plaintiff's case," see Klugesherz v. American Honda Motor Co., Inc., 929 S.W.2d 811, 813 (Mo. Ct. App. 1996), we conclude that the evidence was sufficient to permit the jury to find that the comfort feature design incorporated into the seatbelt system constituted an unreasonably dangerous defect that was a substantial factor in producing injuries over and above those which would have resulted had the seatbelt not been defectively designed.

Bass's closed head injury and resulting brain damage was an indivisible injury incapable of apportionment as a matter of law. See, e.g., Richardson, 552 F. Supp. at 84; Sanders, 817 S.W.2d at 517 ("An indivisible injury results when two or more causes combine to produce a single injury incapable of division on any reasonable basis and each is a substantial factor in bringing about the harm"). Thus, General Motors was properly treated as a concurrent tortfeasor jointly and severally liable for Bass's total injuries. See Richardson, 552 F. Supp. at 83; Sanders, 817 S.W.2d at 517.

In sum, then, because the record contains sufficient evidence to support the verdict of the jury, we conclude that General Motors' motion for judgment as a matter of law was properly denied. Similarly, we conclude that the district court did not abuse its discretion in denying General Motors' alternative motion for a new trial.

## V.

In preparation for litigation, the Basses' previous counsel retained experts to conduct an examination of the Cutlass Ciera. The car was photographed and videotaped and a portion of the driver's seatbelt was removed. The Basses then permitted the automobile to be destroyed for salvage without first allowing General Motors the opportunity to have its own experts examine the car. General Motors moved to dismiss the action with prejudice as a sanction for the failure to preserve relevant evidence. The district court denied this motion, but did impose sanctions upon the Basses by precluding any testimony by experts who had examined the vehicle prior to its destruction and by authorizing defense argument on and a jury instruction regarding the adverse inference that could be drawn from the destruction of the vehicle. See Bass v. General Motors Corp., 929 F. Supp. 1287, 1290 (W.D. Mo. 1996).

A district court is vested with discretion to impose sanctions upon a party under its inherent disciplinary power. See Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277, 280 (8th Cir. 1995); Dillon v. Nissan Motor Co., Ltd., 986 F.2d 263, 267

(8th Cir. 1993). We review the imposition of sanctions by the district court, and its determinations regarding the factual basis for any sanctions, for an abuse of that discretion. See id.; Sylla-Sawdon, 47 F.3d at 280. The ultimate issue to be determined, therefore, "is not what we might have done if the situation had been presented to us originally, but rather, whether the district court abused its discretion in imposing the sanction." Dillon, 986 F.2d at 267. In particular, "whether the extent of a sanction is appropriate is a question peculiarly committed to the district court." Id. at 268 (citing Frumkin v. Mayo Clinic, 965 F.2d 620, 626-27 (8th Cir. 1992)).

In addition to our deferential standard of review, "[t]here is a strong policy favoring a trial on the merits and against depriving a party of his day in court." Baker v. General Motors Corp., 86 F.3d 811, 817 (8th Cir. 1996) (quoting Fox v. Studebaker-Worthington, Inc., 516 F.2d 989, 996 (8th Cir. 1975)). This policy rests upon the recognition "that the opportunity to be heard is a litigant's 'most precious right and should be sparingly denied.'" Baker, 86 F.3d at 817 (quoting Edgar v. Slaughter, 548 F.2d 770, 773 (8th Cir. 1977)).

The Basses' conduct in permitting the car to be destroyed clearly warranted some type of sanction. See, e.g., Dillon, 986 F.2d at 267 ("We do not hesitate in determining that the findings in this case—a retained witness and counsel destroyed evidence that they knew or should have known was relevant to imminent litigation—are sufficient for imposing sanctions"). Without question, General Motors was prejudiced by the Basses' failure to produce the Ciera. See id. at 267-68. Nevertheless, we are not persuaded that the district court abused its discretion in declining to impose the ultimate sanction of dismissal. We agree with the court that General Motors was capable of presenting an adequate defense, and we conclude that the sanctions imposed were commensurate with the Basses' actions and that they fell within the realm of the court's sound discretion.

The judgment is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.