403 F.3d 558
 UNITED STATES of America, Plaintiff,
v.
Cuauhtemoc GONZALEZ-LOPEZ, also known as Tomas, Defendant.
Joseph Low, IV, Appellant,
v.
John Fahle, Appellee.
United States of America, Plaintiff,
v.
Cuauhtemoc Gonzalez-Lopez, also known as Tomas, Defendant.
Karl W. Dickhaus, Appellant,
v.
John D. Stobbs, II, Appellee.
 No. 03-3200.
 No. 03-3201.
 United States Court of Appeals, Eighth Circuit.
 Submitted: September 16, 2004.
 Filed: March 8, 2005.
 
 COPYRIGHT MATERIAL OMITTED Karl W. Dickhaus, argued, St. Louis, MO, for appellant Low; John R. McEachern of St. Louis, MO, for appellant Dickhaus.
 Craig J. Concannon, argued, St. Louis, MO, for Appellee Stobbs.
 John Fahle, argued, San Antonio, TX, pro se.
 Before WOLLMAN, RICHARD S. ARNOLD,[1] and BYE, Circuit Judges.
 BYE, Circuit Judge.
 
 
 1
 During the criminal prosecution of Cuauhtemoc Gonzalez-Lopez, the district court, acting under its inherent power, imposed sanctions against Joseph Low, the attorney retained by the defendant, after finding he violated the rules of professional conduct. In addition to imposing sanctions against Low, the district court imposed sanctions against Low's attorney, Karl Dickhaus, for Dickhaus's conduct in procuring the subpoena of a witness to testify at the hearing for sanctions against Low. Low and Dickhaus appeal the sanctions imposed against them. We reverse both orders of sanctions.
 
 
 2
 * We begin with the facts relevant to attorney Low's appeal.[2] After Gonzalez-Lopez was charged with violating federal drug laws in the Eastern District of Missouri on January 7, 2003, his family retained Texas attorney John Fahle to represent him in the criminal proceeding. Fahle entered his appearance in the case at Gonzalez-Lopez's detention hearing and arraignment on January 8, 2003. Shortly after hiring Fahle, Gonzalez-Lopez contacted California attorney Joseph Low to discuss the possibility of retaining Low to represent him in the criminal case. At Gonzalez-Lopez's request, Low met with him at the jail in Farmington, Missouri, between January 8 and 10, 2003. Within ten days of this meeting, Gonzalez-Lopez hired Low.
 
 
 3
 On February 18, 2003, Low contacted Fahle and informed him that he too was representing Gonzalez-Lopez in the criminal prosecution. Prior to this conversation, Fahle had heard rumors of Gonzalez-Lopez having retained additional counsel. Both Low and Fahle attended an evidentiary hearing before the magistrate judge on March 4, 2003. At this time, Low had not yet entered his appearance on behalf of Gonzalez-Lopez. Initially the magistrate judge permitted Low to participate in the evidentiary hearing based on Low's assurance he would file a motion to appear pro hac vice. At some point during the hearing, however, Low was accused of violating a rule restricting the cross-examination of a witness to one lawyer by passing notes to Fahle. This prompted the magistrate judge to rescind the provisional approval and Low was not permitted to participate in the rest of the hearing.
 
 
 4
 On March 11, 2003, Gonzalez-Lopez asked Fahle to stop representing him and told Fahle he wanted Low to be his sole attorney. Low filed a motion to appear pro hac vice on March 17, 2003. The district court denied the motion the next day without providing oral or written explanation. Low filed another application for admission pro hac vice on April 14, 2003. The district court denied this motion as well.
 
 
 5
 Next, on April 25, 2003, Fahle filed motions for a continuance, to withdraw, and for a show cause hearing. In the motion for a show cause hearing, Fahle accused Low of violating the rules of professional conduct, specifically Rule 4-4.2 of the Missouri Rules of Professional Conduct, by communicating with Gonzalez-Lopez about the criminal prosecution without Fahle's permission even though Low knew Fahle already represented Gonzalez-Lopez in the matter. According to Fahle, Gonzalez-Lopez would not cooperate with him because Low represented to Gonzalez-Lopez that Low was his attorney. Low filed a motion to strike Fahle's motion for a show cause hearing, which the district court denied.
 
 
 6
 A hearing was held on Fahle's motion for sanctions against Low on June 20, 2003. At the hearing, Fahle testified that Low had met with Gonzalez-Lopez without his permission. Low testified of having met and consulted with Gonzalez-Lopez, but only after having been telephoned by him and asking Low to represent him in the criminal prosecution. Low also testified he did not know Gonzalez-Lopez was already represented during this conversation and could not recall exactly when he learned Fahle was representing him. At one point during the hearing, Low testified Gonzalez-Lopez gave him Fahle's name but stated that he told Gonzalez-Lopez to contact Fahle himself. Low told him he would contact Fahle only after Gonzalez-Lopez worked things out with Fahle.
 
 
 7
 At the hearing, the district court also heard evidence submitted by Tiffany Becker, the Assistant United States Attorney who was prosecuting the case against Gonzalez-Lopez. Becker presented evidence of allegedly similar conduct by Low in an earlier case which had been tried before the same district court judge, United States v. Serrano et al., No. 4:01CR450 JCH. Low testified of having not been admonished, sanctioned, or threatened with sanctions in the Serrano case.
 
 
 8
 After the hearing, on August 26, 2003, the district court issued a memorandum and order imposing sanctions against Low and awarding Fahle attorney's fees associated with the motions filed on April 25, 2003. The district court's findings are summarized in the following paragraph:
 
 
 9
 The Court finds that Mr. Low communicated with Defendant, knowing Defendant was represented by Mr. Fahle, without the consent of Mr. Fahle. Furthermore, Mr. Low's testimony at the June 20, 2003 hearing establishes that he did work on the case after he met with Defendant but before he contacted Mr. Fahle. Thus, the Court finds that his communications with Defendant during that time period were regarding the subject of the representation.
 
 
 10
 The court also noted: "Furthermore, Mr. Low's past conduct before this Court in the Serrano case demonstrates a disregard for the local rules concerning communications with represented parties."
 
 II
 
 11
 The facts relevant to attorney Dickhaus's appeal are as follows: On May 16, 2003, Dickhaus entered his appearance to represent Low in the June 20, 2003, hearing initiated by Fahle's motion for sanctions against Low. The district court directed Fahle to file a pre-hearing brief discussing the legal basis for his motion by June 11, 2003. Low filed a response brief on June 18, 2003, and Fahle filed a reply on the morning of the hearing.
 
 
 12
 In Fahle's brief, he made the following assertion: "Counsel has heard that it happened at least one other time in this case when Mr. Low apparently interviewed a co-defendant who was represented by the federal public defender." As it turns out, the federal public defender never alleged of Low speaking to her client. Knowing this, Dickhaus determined Fahle must have been referring to a different attorney, John Stobbs, who had represented one of the defendants in the Serrano case. In the Serrano case, Stobbs had sent a letter to Low, in which he copied the district court and all other counsel in the multi-defendant case, which implied Low had tried to contact defendants represented by counsel without obtaining permission from the defendants' attorneys. In the letter, dated March 10, 2003, Stobbs directed Low not to speak to his client. Thus, Dickhaus concluded what Fahle meant to write in his brief was that Low had communicated with a client represented by Stobbs, not the federal public defender.
 
 
 13
 Dickhaus sought to present evidence at the hearing for sanctions against Low of Low not having talked to defendants without their attorneys' permission, including an affidavit from Stobbs which stated Low did not speak to Stobbs's client, Jorge Guillen, in the Serrano case. It is this endeavor to obtain an affidavit from Stobbs from which the sanctions against Dickhaus and ensuing appeal arise.
 
 
 14
 Dickhaus wrote and telephoned Stobbs in an attempt to obtain an affidavit from Stobbs stating Low had not contacted Guillen without Stobbs's permission. According to Dickhaus, he offered the option of an affidavit out of courtesy as an alternative to subpoenaing Stobbs to the hearing. After Stobbs did not return Dickhaus's phone calls or the letter he faxed to him, on June 19, 2003, the day before the hearing, Dickhaus caused a process server to try to serve a subpoena on Stobbs at his office. Later that day, Stobbs's secretary faxed to Dickhaus's office an affidavit, which stated, in relevant part: 4. On March 7, 2003 I received a telephone call from attorney Joe Low [ ] regarding Mr. Guillen's case.
 
 
 15
 ....
 
 
 16
 7. Prior to receiving a telephone call from Mr. Low[ ], I had been told by attorney Grant Shostak that he had participated in a trial where attorney Low [ ] represented a co-defendant.
 
 
 17
 8. Mr. Shostak told me that Mr. Low[ ] had spoken to his client without Mr. Shostak's authority or permission.
 
 
 18
 9. Because of this, I became concerned that Mr. Low[ ] would try to speak to Mr. Guillen without my permission.
 
 
 19
 10. Since we were having trouble speaking on the telephone, I decided to write Mr. Low[ ] a letter. On March 10, 2003 I wrote Mr. Low[ ] a letter explaining to him that under no circumstances did he or would he have my permission to speak to Mr. Guillen.
 
 
 20
 11. I was concerned that Mr. Low[ ] would have spoken to my client had I not written him specifically advising him that he could not speak to my client. 12. Because my client began cooperating early on, I expected him to enter a plea of guilty which meant that I would not have been present at any trial where Mr. Guillen testified. In the previous trial, Mr. Low[] sprung on Mr. Shostak and this Honorable Court that he had spoken to Mr. Shostak's client without Mr. Shostak's permission during the trial.
 
 
 21
 13. Since I would not be present at trial, I wanted to avoid this type of "surprise" and for this reason I carbon copied Judge Hamilton, Magistrate Mummert, and Assistant U.S. Attorneys Becker and Hoag.
 
 
 22
 14. I believe that in part because of the letter I wrote, Mr. Low[ ] did not attempt to speak to Mr. Guillen.
 
 
 23
 There is some uncertainty in the record about what happened immediately after Dickhaus received the above affidavit. According to Dickhaus, that same day he faxed Stobbs a letter requesting Stobbs remove the portions of the affidavit containing the unsolicited statements "containing [Stobbs's] opinion of what might have or would have happened." The letter also stated that if Stobbs would not revise the affidavit as requested, then it was Dickhaus's intent later that evening to serve Stobbs with a subpoena to attend the hearing for the following day. According to Stobbs, Dickhaus phoned Stobbs's secretary and told her the affidavit was unsatisfactory in an angry, rude, and demeaning fashion, and told her unless the affidavit was done to his liking, a subpoena would be served. Stobbs contends he refused to change the affidavit because he felt he had complied with Dickhaus's request and because he believed Low's actions needed to be placed in proper context. He also states he did not call Dickhaus back because of the demeaning and rude way Dickhaus treated his secretary.
 
 
 24
 After receiving no further response from Stobbs, Dickhaus sent his office assistant with another subpoena to Stobbs's home address. When Dickhaus's process server arrived at the residence, she discovered the home was vacant and for sale. There was, however, a phone number on the "for sale" sign. Posing as an interested buyer, Dickhaus's process server called the number. Because Stobbs had just arrived home from work when the call came in, Stobbs's wife, who was six months pregnant and on partial bed rest, decided to show the house. Stobbs's wife told Stobbs she would be back in five minutes. According to Stobbs, after waiting about twenty to twenty-five minutes for his wife to return home, he became fearful about what may have happened to his pregnant wife. Stobbs, with his two young children, drove six blocks to his old house to check on his wife. After arriving at the old house and upon stepping out of the car, Stobbs was served with the subpoena. The process server provided Stobbs with another opportunity of providing a redacted affidavit instead of appearing at the hearing.
 
 
 25
 That night, Stobbs drafted a motion to quash the "bogus subpoena" and for sanctions and contempt, in which he accused Dickhaus of "ball bat" tactics, "sleaze and pettyfoggery," and which he filed the next morning before the hearing on the motion for sanctions against Low. At the hearing, the district court quashed the subpoena on the grounds that Dickhaus used a civil subpoena form in a criminal case. The district court set a hearing date of July 22, 2003, for Stobbs's motion for sanctions against Dickhaus. After the hearing, on August 26, 2003, the district court ruled on Stobbs's motion. The order denied Stobbs's motions for contempt and sanctions, finding Dickhaus had not violated a court order. However, the district court found Dickhaus acted in "bad faith" and his behavior in the procurement of the subpoena was "vexatious." According to the court, "the proper recourse would have been to move to strike the objectionable portions [of Stobbs's proffered affidavit]." Acting under its inherent power, the court ordered Dickhaus to pay Stobbs's attorney's fees in the amount of $2,750.
 
 III
 
 26
 We generally review a district court's imposition of sanctions pursuant to its inherent power for an abuse of discretion. Chambers v. NASCO, Inc., 501 U.S. 32, 55, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (citations omitted); Bass v. General Motors Corp., 150 F.3d 842, 851 (8th Cir.1998) (citation omitted). However, where the district court's imposition of sanctions against an attorney turns on an interpretation of the law, as in Low's case, we review the decision to impose sanctions de novo. See Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist., 103 F.3d 1422, 1434 (8th Cir.1997) (citing Actors' Equity Ass'n v. Am. Dinner Theatre Inst., 802 F.2d 1038, 1042 (8th Cir.1986)). In other words, "[a] district court by definition abuses its discretion when it makes an error of law." Computrol, Inc. v. Newtrend, L.P., 203 F.3d 1064, 1070 (8th Cir.2000) (citing Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)).
 
 IV
 
 27
 We begin our discussion by addressing the sanctions imposed against Low. He raised two arguments to challenge the order of sanctions. He argued the district court lacked jurisdiction to impose sanctions against him because the sanctioned conduct was based on the alleged civil tort of interference with a professional relationship. He also challenged the order of sanctions on the merits.
 
 
 28
 At the outset, we reject Low's argument about the district court lacking jurisdiction to sanction him for his conduct in the criminal proceeding. A district court has authority under its inherent power to assess attorney's fees against a party which has "`acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Kelly v. Golden, 352 F.3d 344, 352 (8th Cir.2003) (quoting Chambers, 501 U.S. at 45-46, 111 S.Ct. 2123, and citing Hoover v. Armco, Inc., 915 F.2d 355, 357 (8th Cir.1990)). "This inherent power is similar to the court's other powers to impose sanctions, but it is both broader in that it may reach more litigation abuses and narrower in that it may only be for attorney's fees." Id. (citing Chambers, 501 U.S. at 46, 111 S.Ct. 2123); see also United States v. Kouri-Perez, 187 F.3d 1, 6-7 (1st Cir.1999). Thus, we turn to the merits of the claim.
 
 
 29
 The Eastern District of Missouri follows the Missouri Rules of Professional Conduct. E.D. Mo. Local R. 83-12.02. Missouri Rule 4-4.2 provides: "In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so." Mo. Rules of Prof'l Conduct R. 4-4.2. The district court determined Low violated Missouri Rule 4-4.2 after finding Low communicated with Gonzalez-Lopez about his case without Fahle's consent. In reaching this conclusion, the district court interpreted Rule 4-4.2 to prohibit an attorney from communicating with a represented client without first obtaining permission from the client's existing counsel, even if the attorney is not representing any other party in the matter. The district court based its interpretation of Rule 4-4.2 on the fact that the Missouri Supreme Court had not adopted a non-uniform amendment to ABA Model Rule 4.2. According to the court, the referenced amendment provides: "When a person... that is represented by a lawyer in a matter seeks advice regarding that matter from another lawyer, the second lawyer is not prohibited by paragraph (a) from giving such advice without notifying or seeking consent from the first lawyer." We disagree with the district court's interpretation of Missouri Rule 4-4.2.
 
 
 30
 Rule 4-4.2 consists of one sentence, which begins with the clause, "In representing a client." It is evident from the inclusion of the words "In representing a client" that the remainder of the text of Rule 4-4.2, which prohibits unauthorized communication with represented parties in a matter, is limited to attorneys who are involved in the matter and does not apply to an attorney not so involved. The Rule's limited applicability to attorneys who are involved in the case is also evident from an examination of the purpose of the Rule. Missouri Rule 4-4.2 is "essentially identical" to Rule 4.2 of the ABA Model Rules. Smith v. Kansas City S. Ry., 87 S.W.3d 266, 271 (Mo.Ct.App.2002). The purpose of Rule 4.2, which can be found in the first comment to Rule 4.2, is to "protect[ ] a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship and the uncounselled disclosure of information relating to the representation." ABA Model Rules of Prof'l Conduct R. 4.2 cmt. 1 (emphasis added). The comments further provide: "Nor does this Rule preclude communication with a represented person who is seeking advice from a lawyer who is not otherwise representing a client in the matter...." ABA Model Rules of Prof'l Conduct R. 4.2 cmt. 4.
 
 
 31
 Furthermore, the district court's interpretation of Rule 4-4.2 would prevent parties in litigation from freely consulting with outside attorneys to obtain additional advice about their cases, hire additional counsel, or even hire different counsel. In the context of criminal prosecutions, the district court's interpretation of Rule 4-4.2 unjustifiably interferes with the criminal defendant's qualified right under the Sixth Amendment to be represented by counsel of the defendant's choosing, as illustrated in the underlying criminal case. See United States v. Cuauhtemoc Gonzalez-Lopez, 399 F.3d 924 (8th Cir.2005). The Sixth Amendment right to be represented by counsel of one's choice in a criminal proceeding is discussed at length therein.
 
 
 32
 Our interpretation of Missouri Rule 4-4.2 is also consistent with an advisory opinion issued by the Legal Ethics Counsel of the Missouri Bar. The advisory opinion discusses several scenarios strikingly similar to the events which took place in the present case.
 
 
 33
 QUESTION: Attorney frequently receives calls from potential clients who are currently represented by another attorney. How should Attorney handle this situation? May Attorney invite the potential client to come to Attorney's office for a consultation? May Attorney offer the potential client a contract if that is what the potential client desires? May Attorney take over the representation of the matter if that is what the potential client asks of Attorney? May Attorney assist the new client in drafting a letter to the other attorney indicating that the client wishes to terminate the relationship if it is at the request of the client?
 
 
 34
 ANSWER: Attorney may talk with and consult with a person who is already represented by counsel but who is seeking legal advice from Attorney regarding the matter. If the person chooses to hire Attorney, Attorney may enter into a contract with that person and assume the representation. Attorney may also assist the client with informing the other attorney that the client is terminating that attorney-client relationship. Rule 4-4.2 does not apply to this situation because Attorney is not representing a client in Attorney's communications with the person who is seeking to consult with Attorney. This opinion only addresses the Rules of Professional Conduct. It does not address any legal issues that may be involved in termination of the attorney-client relationship.
 
 
 35
 Mo. Bar Adm. Advisory Opinion No. 980173. Fahle argues Low waived the right to present the advisory opinion on appeal because Low did not present it in the district court proceeding. We disagree. It is undisputed Low argued in district court his conduct did not violate Missouri Rule 4-4.2.
 
 
 36
 In sum, we hold Rule 4-4.2 does not prohibit an attorney who is contacted by a party to litigation from communicating with the party about the case without first obtaining permission from the party's existing counsel when the attorney is not involved in the matter. It is undisputed Low was not representing any party in the criminal prosecution when he and Gonzalez-Lopez engaged in discussions about the possibility of Low taking on the representation. We therefore reverse the order imposing sanctions against Low.
 
 V
 
 37
 Our discussion next turns to the sanctions imposed against Dickhaus. He raises the following three arguments on appeal: 1) the district court erred in awarding attorney fees to an attorney who appeared pro se; 2) the district court's findings that Dickhaus's conduct was "in bad faith" and "vexatious" were an abuse of discretion; and 3) the district court abused its discretion in the amount of attorney's fees awarded. We address only Dickhaus's challenge of the district court's findings that his procurement of the subpoena of Stobbs was "in bad faith" and "vexatious."
 
 
 38
 The district court found Dickhaus acted in bad faith by subpoenaing Stobbs to the hearing for sanctions against Low. The only apparent basis for concluding Dickhaus acted in bad faith was the district court's finding that "the proper recourse would have been to move to strike the objectionable portions [of Stobbs's proffered affidavit]." Additionally, the district court found Dickhaus's manner of serving Stobbs a subpoena "at the eleventh hour" as being vexatious and patently oppressive.
 
 
 39
 With respect to Dickhaus's decision to subpoena Stobbs, Dickhaus argues he should not have been required to submit an affidavit containing extraneous, inadmissible material containing invective and innuendo against his client, noting his professional obligation to provide his client, Low, with zealous representation. He points out it was not guaranteed the district court would have granted a motion to strike the contested portions of Stobbs's affidavit, and argues even if the motion to strike was granted, the negative assertions would be in the court's mind. With respect to the district court's finding Dickhaus acted vexatiously in the manner of service, he asserts it is common to subpoena an individual at home and the method he used to serve Stobbs is a common method when dealing with an individual who appears to be attempting to dodge service.
 
 
 40
 Although we do not necessarily agree with Dickhaus that his method of service is one which is commonly followed, we do not believe the record supports a finding of vexatious, bad faith conduct. There is no evidence Dickhaus knew Stobbs's wife was pregnant and bed-ridden or that he knew Stobbs would send his wife to show the house. Furthermore, we have considerable difficulty understanding the district court's finding of Dickhaus being required to present a redacted affidavit rather than call Stobbs as a witness at the hearing. We also do not understand how Dickhaus's decision to subpoena Stobbs instead of presenting a redacted affidavit demonstrates bad faith.
 
 
 41
 We hold it was an abuse of discretion for the district court to impose sanctions against Dickhaus. The district court failed to consider Dickhaus's professional obligation to provide Low with zealous representation within the confines of the rules of law and ethics, see Mo. Rules of Prof'l Conduct R. 4-1.3, and failed to consider Stobbs's conduct which could reasonably be interpreted as an attempt at dodging a subpoena. See Aaron v. Target Corp., 357 F.3d 768, 774 (8th Cir.2004) ("An abuse of discretion occurs if a relevant factor that should have been given significant weight is not considered, if an irrelevant or improper factor is considered and given significant weight, or if a court commits a clear error of judgment in the course of weighing proper factors.") (citation omitted). Our holding is further supported by the inability of Stobbs's attorney at oral argument to articulate any purpose served by sanctioning Dickhaus's conduct in procuring the subpoena of Stobbs.[3]
 
 VI
 
 42
 The district court's order imposing sanctions against Low is reversed. The district court's order imposing sanctions against Dickhaus is also reversed.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Richard S. Arnold died on September 23, 2004. The case has been decided by the remaining members of the panel pursuant to 28 U.S.C. § 46(d) and 8th Cir. R. 47E
 
 
 [2]
 The facts and issues in Low's appeal are closely related to the facts and issues in our court's opinion addressing Cuauhtemoc Gonzalez-Lopez's direct appeal of his criminal convictionSee United States v. Cuauhtemoc Gonzalez-Lopez, 399 F.3d 924 (8th Cir.2005).
 
 
 [3]
 Our holding should in no way be construed as approving the manner in which Dickhaus conducted himself in his communications with Stobbs. If in fact Dickhaus treated Stobbs's secretary in an angry, rude, and demeaning fashion during his telephone conversations with her, small wonder it is that Stobbs declined to respond to the call. The need for the subpoena, then, may well have been the result of Dickhaus's unprofessional conduct rather than, as he would characterize it, the need to fulfill his professional obligation to provide his client with zealous representation