PER CURIAM
*227 This case involves Minn. R. Prof. Conduct 4.2, the no-contact rule, which limits a lawyer's communications "with a person the lawyer knows to be represented by another lawyer in the matter." The Director of the Office of Lawyers Professional Responsibility (the Director) issued an attorney a private admonition for violating Rule 4.2 by communicating with a represented party in a defamation case in which the attorney represented another party. Following an evidentiary hearing, a panel of the Lawyers Professional Responsibility Board (the Panel) affirmed the Director's admonition. The attorney appealed. We conclude that the Panel did not clearly err in finding that the attorney violated Rule 4.2. We further conclude that the appropriate discipline for this isolated misconduct is a private admonition.
FACTS
Appellant was admitted to practice law in Minnesota in 1982, and primarily practices in the area of insurance litigation. He has no prior disciplinary record. Appellant was retained in 2014 to represent J.W., who was a defendant, along with others, in a defamation action.
J.W.'s brother, N.W., was a co-defendant.[1] N.W. was represented by an attorney (complainant here) hired by N.W.'s insurer, Liberty Mutual. Complainant was defending N.W. subject to a reservation of rights, meaning that Liberty Mutual had reserved the right to deny coverage to N.W. as the case developed. Complainant practiced at a captive law firm as a direct employee of Liberty Mutual. Complainant did not-and could not-represent N.W. on insurance coverage issues because the reservation of rights created a conflict of interest with her employer.
Trial was set for February 16, 2016. On Friday, February 5, 2016, the parties attended a mediation. N.W.'s attorney, complainant, was unable to attend the mediation, but she sent substitute counsel and an insurance claims representative in her stead. At mediation, J.W. orally agreed to settle with the plaintiffs for $75,000, and the claims against the other two defendants also settled. Only the claims against N.W. remained unresolved.
The following Monday, February 8, 2016, the plaintiffs, by letter, expressed their willingness to extend a Miller - Shugart settlement offer to N.W. for an unspecified dollar amount.[2] That same day, Liberty Mutual offered the plaintiffs $35,000 to settle the claims against N.W. The next day, February 9, 2016, plaintiffs counter-offered with a settlement demand of $75,000 cash or, alternatively, a Miller - Shugart agreement in the amount of $695,000. Complainant did not immediately discuss these offers with her client, N.W., *228 because she wanted to first communicate with Liberty Mutual. She left N.W. a voicemail the next morning, on February 10, 2016, but never discussed the offers with him.
N.W. spoke with his brother J.W. about the Miller - Shugart offer on February 9, 2016.[3] J.W. then contacted his own attorney, appellant, and asked him to speak with N.W. Appellant agreed, and N.W. sent the proposed Miller - Shugart settlement agreement for appellant's review.[4]
On the morning of February 10, 2016, N.W. telephoned appellant for legal advice. At that time, appellant understood that "[c]omplainant [was] not ... representing N.W. regarding the coverage issues ... or the plaintiffs' Miller - Shugart settlement offer because of the likely personal conflict of interest [c]omplainant had." As appellant correctly observes, the Miller - Shugart settlement offer created a conflict for complainant between her client N.W.'s interests and her employer Liberty Mutual's interests. See, e.g. , Pine Island Farmers Coop v. Erstad & Riemer, P.A. , 649 N.W.2d 444, 450 (Minn. 2002) (recognizing that "the interests of the insured and the insurer may conflict, making it difficult for defense counsel to remain loyal to ... and exercise his or her independent professional judgment for the benefit of [the] client").
During this phone call, appellant gave N.W. legal advice about the proposed Miller - Shugart agreement and the effect of Liberty Mutual's reservation of rights on N.W.'s personal exposure. Appellant understood that he was "acting as N.W.'s independent counsel" and that he "had an attorney-client relationship with N.W." Appellant testified that he was "talking to [N.W.] about an unrelated matter" because he "wasn't talking about the defamation case"-he "was talking about the coverage concerns" and "what happens with the Miller - Shugart and how [N.W.] can protect himself." Appellant further testified that he did not know about, and did not give legal advice regarding, the $35,000 or $75,000 settlement offers.
Later that morning, N.W. signed the Miller - Shugart offer, without complainant's advice or knowledge.
Thereafter, complainant filed an ethics complaint regarding appellant's conduct. The Fourth District Ethics Committee investigated and concluded that appellant had not violated any rule of professional conduct. The Director, however, independently determined that appellant had violated Minn. R. Prof. Conduct 4.2, and issued a private admonition. See Rule 8(d)(2), Rules on Lawyers Professional Responsibility (RLPR).
Appellant appealed the admonition to a Panel of the Lawyers Professional Responsibility Board. See Rule 8(d)(2)(iii), RLPR. The Panel held an evidentiary hearing and heard testimony from appellant, complainant, and appellant's expert witness. See Rule 8(d)(4)(ii), RLPR. Reviewing the matter de novo, the Panel (with one member dissenting) affirmed the admonition. See Rules 8(d)(2)(iii), 9(j)(2), RLPR. Pursuant to Rule 9(m), RLPR, appellant appealed the admonition to our court.
ANALYSIS
I.
We will uphold a panel's findings "when those findings have evidentiary support *229 in the record and are not clearly erroneous." In re Panel File No. 41310 , 899 N.W.2d 821, 825 (Minn. 2017). But "[i]nterpreting the Minnesota Rules of Professional Conduct ... presents a question of law, which we review de novo." Id. In interpreting the plain language of the Rules of Professional Conduct, we may consider dictionary definitions, as we do when we interpret statutes. See, e.g. , In re Torgerson , 870 N.W.2d 602, 610 (Minn. 2015) ; In re Panel Case No. 19453 , 690 N.W.2d 716, 720 (Minn. 2005). We may also consider the comments to the Rules; precedent from our court and foreign jurisdictions; and outside resources, such as the Restatement and the A.B.A. Model Rules. See, e.g. , Panel File No. 41310 , 899 N.W.2d at 826; In re Panel File No. 39302 , 884 N.W.2d 661, 665-68, 670 (Minn. 2016).
The rule at issue here is Minn. R. Prof. Conduct 4.2, "Communication with Person Represented by Counsel," which provides as follows:
In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.
This rule essentially has three elements and one exception:
(1) In representing his or her own existing client,
(2) A lawyer shall not communicate about the subject of the representation,
(3) With a person whom the lawyer knows to be represented by another lawyer in the matter,
(4) Unless: (a) the lawyer has the other lawyer's consent, or (b) is otherwise authorized to do so by law or court order.
The purpose of Rule 4.2 is to "protect[ ] a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter," including against "interference by those lawyers with the client-lawyer relationship." Minn. R. Prof. Conduct 4.2 cmt. 1. The rule is also intended to "protect[ ] the right of counsel to be present during any communication between the counsel's client and opposing counsel." State v. Miller , 600 N.W.2d 457, 464 (Minn. 1999). Although we have referred to the language of Rule 4.2 as "plain and unambiguous," State v. Clark , 738 N.W.2d 316, 339 (Minn. 2007), we have never parsed the language to explain what each element and the exception means, as we are required to do here.
A.
We begin with the first element of Rule 4.2 : "[i]n representing a client." Appellant argues for a purpose-driven interpretation of this phrase, in which the element is satisfied only if the attorney acts "in furtherance of" representing his or her own client. The Director disagrees, arguing that the phrase refers to the temporal duration of the attorney-client relationship. This element was satisfied under either interpretation.
When appellant gave legal advice to N.W., he was representing J.W. Appellant had not filed a notice of withdrawal with the court or otherwise executed a document formally terminating the attorney-client relationship with J.W. See Minn. Gen. R. Prac. 105 ("After a lawyer has appeared for a party in any [civil] action, withdrawal will be effective only if written notice of withdrawal is served ... and is filed...."); see also In re Milloy , 571 N.W.2d 39, 43 (Minn. 1997) ("If there is any doubt ... the burden falls on the *230 attorney to clarify, preferably in writing, that the [attorney-client] relationship has ended." (citation omitted) (internal quotation marks omitted) ). Although J.W.'s case had been settled by verbal agreement, appellant had not completed his representation because the settlement had not been reduced to writing or submitted to the court. See Minn. R. Prof. Conduct 1.16 cmt. 1 ("Ordinarily, a representation in a matter is completed when the agreed-upon assistance has been concluded."). We therefore conclude that appellant had an ongoing attorney-client relationship with J.W. when he communicated with N.W.[5]
This element is also satisfied under the appellant's alternative "in furtherance of" interpretation of "[i]n representing a client." Appellant spoke with N.W. at the specific request of his client, J.W., which demonstrates that J.W. had an interest in appellant giving advice to his brother, N.W. Further, J.W. likely had an interest in not having to testify at trial, which he might have had to do if N.W. had not settled. Because appellant had both an ongoing attorney-client relationship with J.W. and acted in furtherance of that representation, we conclude that the Panel did not clearly err in finding that appellant was "representing a client."
B.
We turn next to the second element: whether appellant communicated with N.W. "about the subject of the representation." Appellant argues that he did not communicate about the subject of the representation because the communication with N.W. was not about a subject within the scope of complainant's representation of N.W. The Director maintains that appellant's legal advice to N.W. nonetheless "implicated the subject of the representation" because it "involved advice about the defamation lawsuit."[6]
We conclude that the second element is satisfied. In litigated matters, the "subject" is synonymous with the "case" or "matter" as a whole. "[T]he subject of the representation" here was the defamation case.[7] Appellant's communication with N.W. was about the defamation case. Appellant and N.W. discussed the Miller - Shugart offer, which, when accepted, settled the claims against N.W. in the defamation case. See also NLRB v. Autotronics, Inc. , 596 F.2d 322, 325-26 (8th Cir. 1979) (concluding attorney "clearly violated" the A.B.A. no-contact rule, which is comparable to Minn. R. Prof. Conduct 4.2, "by discussing settlement with [a represented party]"). The Panel's finding that the second element of Rule 4.2 was satisfied is therefore not clearly erroneous.
C.
The third element-whether appellant communicated "with a person"
*231 whom he "kn[ew] to be represented by another lawyer in the matter"-requires that we consider the meaning of "matter." Appellant maintains that he "did not know that [c]omplainant was representing N.W. regarding the subject that [he] and N.W. discussed, i.e., the Miller - Shugart settlement proposal." He thus interprets the word "matter" narrowly, to mean the specific "subject" about which the represented party seeks advice. The Director interprets the word "matter" more broadly, to mean "a transaction or legal dispute."
As with the meaning of "subject," we conclude that, in litigated matters, the "matter" is synonymous with the "case." This interpretation is consistent with the use of "matter" elsewhere in the Minnesota Rules of Professional Conduct, which oftentimes means the same as "case" or "controversy." See, e.g. , Minn. R. Prof. Conduct 1.11(e)(1) (providing that "[a]s used in this rule, the term 'matter' includes ... any judicial or other proceeding, ... contract, claim, controversy, investigation, charge, accusation, arrest, or other particular matter"); Minn. R. Prof. Conduct 1.5 (referencing "a contingent fee matter" and "domestic relations matter"); Minn. R. Prof. Conduct 8.5 (referring to "a matter pending before a tribunal"). Similarly, "matter" is defined as "[a] subject under consideration, esp. involving a dispute or litigation" or a "case," which in turn is defined as "[a] civil or criminal proceeding, action, suit, or controversy."[8] Matter , Black's Law Dictionary (10th ed. 2014).
Here, the "matter" was the pending defamation case. Appellant knew that N.W. was represented by complainant in that case. For about 2 years, appellant and complainant, representing co-defendants, corresponded through phone calls and letters and attended various depositions and hearings. See Minn. R. Prof. Conduct 4.2 cmt. 8 (providing that the lawyer's "actual knowledge of the fact of the representation ... may be inferred from the circumstances"). Thus, the Panel did not clearly err in finding that this third element of Rule 4.2 was satisfied.
D.
We consider last whether the exception in Rule 4.2 authorized appellant's communication with N.W. The no-contact rule does not apply if "the lawyer has the consent of the other lawyer or is authorized" to communicate with the represented person "by law or a court order." Minn. R. Prof. Conduct 4.2. Appellant asserts that his communication was authorized, and not in violation of Rule 4.2, because a client is entitled to a second opinion from another attorney. The Director argues that appellant's conduct was not authorized. We agree with the Director.
It is true that a client has a right to choose his or her own attorney. See Christensen v. Eggen , 577 N.W.2d 221, 225 (Minn. 1998). But this right is not boundless, nor does it immunize an attorney's *232 violation of Rule 4.2. As comment 4 to Rule 4.2 states, the no-contact rule does not "preclude communication with a represented person who is seeking advice from a lawyer who is not otherwise representing a client in the matter ." Minn. R. Prof. Conduct 4.2 cmt. 4 (emphasis added). Put another way, although N.W. had a right to a second opinion, appellant did not have an absolute right to provide that second opinion because he was already representing a client in the matter. Id.
Nor does a client's right to the attorney of the client's choice allow the client to waive the protections of the no-contact rule. The rule "applies even though the represented person initiates or consents to the communication." Minn. R. Prof. Conduct 4.2 cmt. 3. As we have noted, Rule 4.2 aims to protect not only clients' rights but also their attorneys' interests. See Miller , 600 N.W.2d at 464 ("The focus of MRPC 4.2 is on the obligation of attorneys to respect the relationship of the adverse party and the party's attorney. The right belongs to the party's attorney, not the party, and the party cannot waive the application of the no-contact rule-only the party's attorney can approve the direct contact and ... waive the attorney's right to be present...." (citation omitted) ). Thus, the Panel did not clearly err in concluding that appellant's communication with N.W. was not "authorized" by consent or by law.
The Panel's findings that the elements of Rule 4.2 were satisfied are not clearly erroneous. Appellant thus violated Rule 4.2.
II.
Finally, we turn to the appropriate discipline for appellant's violation of Rule 4.2. Under Rule 8(d)(2), RLPR, "if the Director concludes that a lawyer's conduct was unprofessional but of an isolated and nonserious nature, the Director may issue an admonition." The Panel here affirmed the Director's private admonition. "We give great weight to the recommendations of the Panel," but we have the final responsibility for determining the appropriate discipline. Panel File No. 39302 , 884 N.W.2d at 669. We may affirm the admonition or "make such other disposition as [we] deem[ ] appropriate." Rule 9(m), RLPR.
Appellant contends that under the factual circumstances here, he should not receive a private admonition. We disagree.
We are guided by the principle that the purpose of attorney discipline "is not to punish the attorney, but rather to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." In re Fairbairn , 802 N.W.2d 734, 742 (Minn. 2011) (citation omitted) (internal quotation marks omitted). In determining what discipline to impose, we consider four factors: "(1) the nature of the misconduct, (2) the cumulative weight of the disciplinary violations, (3) the harm to the public, and (4) the harm to the legal profession." In re Panel File No. 99-5 , 607 N.W.2d 429, 431 (Minn. 2000).
The nature of the misconduct here is "nonserious." When appellant communicated with N.W., he incorrectly believed that he was no longer representing J.W. and that N.W. was unrepresented as to the Miller - Shugart settlement. Panel File No. 39302 , 884 N.W.2d at 669 (concluding misconduct was non-serious where attorney "wrongly believed that he could negotiate a settlement in Minnesota without being licensed"). The misconduct is also "isolated" because it was a one-time violation, and appellant has no record of discipline. See, e.g. , Panel File No. 41310 , 899 N.W.2d at 826.
*233 Similarly, the cumulative weight of the misconduct is minimal because it involved a single phone call. See id. at 826 (affirming panel's recommendation of a private admonition for the breach of attorney-client confidentiality in "a single e-mail").
As for harm to the public, appellant and the Director agree that N.W. did not suffer any harm. As to the insurer, it is not clear whether it was harmed by the rule violation; after all, the events unfolded as they did, in part, because of the insurer's choice to defend N.W. under a reservation of rights using one of its own attorneys. And complainant's testimony about what she planned to do or would have done relative to the Miller - Shugart proposal, absent the attorney's communication with N.W., was not a model of clarity. Nor do we see a harm to the general public. Nevertheless, the absence of harm to others "does not reduce a violation of a rule, however technical, into no violation and thus no discipline at all." In re MDK , 534 N.W.2d 271, 272 (Minn. 1995).
As for harm to the profession, we have never specifically commented on the harm caused by violations of Rule 4.2. See, e.g. , In re Copeland , 505 N.W.2d 606, 607 (Minn. 1993). Rule 4.2 seeks to protect both attorneys' and clients' interests in the attorney-client relationship, and the profession is harmed when an attorney breaches this rule and violates the sanctity of another attorney-client relationship. Cf. Panel File No. 41310 , 899 N.W.2d at 826 (concluding that breach of the attorney-client privilege, which is "fundamental to the attorney-client relationship," "undercuts the public's trust in attorneys").
We recently concluded that a private admonition was the appropriate discipline for an attorney's one-time disclosure of confidential communications with a former client in violation of Minn. R. Prof. Conduct 1.9(c)(2). See Panel File No. 41310 , 899 N.W.2d at 826-27. This case implicates similar attorney-client relationship concerns. A private admonition is the appropriate discipline here as well.
CONCLUSION
For the foregoing reasons, we affirm the private admonition.
Private admonition affirmed.
THISSEN, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

The two other defendants in the defamation action were separately represented.

A Miller - Shugart settlement occurs when "the insurer has denied," or threatens to deny, "all coverage, and the abandoned insured ... agrees with the plaintiffs that judgment may be entered against it in return for the plaintiffs releasing the insured from any personal liability." Peterson v. Wilson Twp. , 672 N.W.2d 556, 557 n.1 (Minn. 2003) ; see Miller v. Shugart , 316 N.W.2d 729, 735-36 (Minn. 1982). The plaintiffs then "undertake the burden and risk of collecting the ... settlement from the insurer." McGlothlin v. Steinmetz , 751 N.W.2d 75, 77 n.1 (Minn. 2008).

It is not clear from the record that N.W. knew about Liberty Mutual's $35,000 cash offer or the plaintiffs' responsive $75,000 cash demand.

The record does not reveal how N.W. learned about, or received a copy of, the Miller - Shugart offer.

Appellant continued acting as attorney of record for J.W. for at least two months after the mediation. Specifically, appellant signed a stipulation to dismiss that was filed with the court on April 26, 2016. This subsequent act demonstrates that appellant and J.W. continued to be in an attorney-client relationship.

Both appellant and the Director seem to assume that "the subject of the representation" refers to the scope of the represented party's attorney-client relationship, rather than the subject of the attorney's representation of his own pre-existing client. In this case, we need not decide whether "the subject of the representation" refers to the attorney's (appellant's) relationship with his or her own pre-existing client (J.W.) or the relationship of the represented party (N.W.) with his or her counsel (complainant).

Although our holding today is in the context of a litigated matter, we do not mean to suggest that Rule 4.2 does not apply before litigation has been commenced. The rule refers to "the subject" and "the matter," not "the litigated matter." And it applies to represented "person[s]," not just "parties."

Case law from the Eighth Circuit and another state supreme court lends additional support for our interpretation of "matter." See United States v. Gonzalez-Lopez , 403 F.3d 558, 565 (8th Cir. 2005) (interpreting Missouri's comparable Rule 4-4.2 and commenting that it is "limited to attorneys who are involved in the matter ," in other words, "attorneys who are involved in the case " (emphasis added) ); People v. Santiago , 236 Ill.2d 417, 339 Ill.Dec. 1, 925 N.E.2d 1122, 1129-30 (2010) (concluding Illinois's "Rule 4.2 did not prohibit the prosecutors from communicating with defendant in that [criminal] case," even though they knew him to be represented in a child-protection case, because "the parameters of the rule" are "defined from ... a case perspective," not "a fact perspective" (emphasis added) ).