STATE OF MINNESOTA

IN SUPREME COURT

A24-0113

Original Jurisdiction

Per Curiam
Took no part, Gaïtas, J.

In re Petition for Disciplinary Action against
R. James Jensen, Jr., a Minnesota Attorney,
Registration No. 0164409.

Filed: October 23, 2024
Office of Appellate Courts

_____

Susan M. Humiston, Director, Office of Lawyers Professional Responsibility, Saint Paul, Minnesota, for petitioner.

R. James Jensen, Jr., Roseville, Minnesota, pro se.

_____

S Y L L A B U S

Disbarment is appropriate reciprocal discipline where an attorney disobeyed many court orders, made misrepresentations to a tribunal, filed numerous frivolous motions and appeals, engaged in dishonest conduct, and was disbarred in another jurisdiction for that misconduct.

Disbarred.

1

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility (the Director) filed a petition for reciprocal discipline against R. James Jensen, Jr. upon learning that he had been disbarred in Washington state in 2018. *See In re Jensen* (*Jensen IV*), 430 P.3d 262, 273 (Wash. 2018). The Washington Supreme Court disbarred Jensen for conduct including violating court orders, engaging in frivolous litigation, making misrepresentations to multiple courts, and contacting opposing parties he knew to be represented by counsel. The misconduct did not involve his representation of clients but arose out of personal legal matters—his divorce and related property disputes. *Id.* Jensen has a considerable disciplinary history based on similar misconduct in representing clients, including a reprimand, an admonition, and an indefinite suspension. We conclude that disbarment is an appropriate sanction.

## FACTS

Jensen was admitted to practice law in Minnesota in May 1985. We publicly reprimanded him in 1991, *In re Jensen (Jensen I)*, 468 N.W.2d 541, 546 (Minn. 1991); admonished him in 1995, *Appeal of Admonition Regarding A.M.E. (Jensen II)*, 533 N.W.2d 849, 851 (Minn. 1995); and indefinitely suspended him for a minimum of 18 months in 1996. *In re Jensen* (*Jensen III*), 542 N.W.2d 627, 634 (Minn. 1996). His past misconduct included disobeying court orders and violating procedural rules of appeal, *Jensen I*, 468 N.W.2d at 544–45, as well as asserting frivolous claims, refusing to make

court-ordered payments, and making misrepresentations to judicial officers. *Jensen III*, 542 N.W.2d at 634.

We reinstated Jensen to practice law in Minnesota in 1999. *In re Jensen*, 593 N.W.2d 240, 241 (Minn. 1999) (order). In 2003, Jensen was administratively suspended in Minnesota for nonpayment of annual registration fees. There is no evidence that he has represented any client as a Minnesota attorney since the 1996 suspension. In 2007, he moved to Washington state, where he was admitted to practice in 2008.

In 2018, the Washington Supreme Court disbarred Jensen. *Jensen IV*, 430 P.3d at 273. "Unless we determine otherwise, a final determination in another jurisdiction that a lawyer has committed misconduct conclusively establishes that misconduct for purposes of our reciprocal discipline proceeding." *In re Wolff*, 810 N.W.2d 312, 316 (Minn. 2012); *see* Rule 12(d), Rules on Lawyers Professional Responsibility (RLPR). Aside from his claims discussed below—that imposition of reciprocal discipline would be "unfair," "unjust," and "substantially different from discipline warranted in Minnesota"—Jensen failed to provide any reason to not find conclusive the Washington Supreme Court's final determination that he engaged in the misconduct at issue. As a result, we treat the findings from the Washington proceeding as conclusive. The findings by the Washington Supreme Court are set forth below.

### *The Mukilteo House*

In 2013, Jensen's wife, Therese, who was suffering from severe multiple sclerosis, filed for divorce. Jensen and Therese owned a home in Mukilteo, Washington, which Therese wanted to sell as part of the dissolution proceedings. On December 24, 2013, she

secured a court order to control and list the house for sale. She contacted a real estate agent, L.F., to help sell the house.

In January 2014, Jensen placed a "for sale by owner" sign on the front lawn. He refused L.F.'s request to remove his sign. When workers later came to install L.F.'s "for sale" sign, Jensen tore the post out of the ground. He also placed a note on the front door which stated, "Buyer Beware Title is unlikely to be cleared for A sale – call [Jensen's phone number]." On January 22, 2014, Jensen sent an email to L.F. and to Therese's attorney telling them that they could not sell the home.

On February 10, 2014, a Washington superior court found that Jensen had "obstruct[ed] the listing and sale" of the house and ordered him to "fully cooperate with the sale . . . up to [the] point of signing closing document[s]." At the hearing, he agreed to cooperate. The next day, Jensen filed a motion with the court in which he claimed that he had "made no efforts of any kind" to obstruct Therese's sale of the home. On February 12, 2014, the court was informed that Jensen's "for sale by owner" sign was still on the lawn.

Therese received a written offer on the house, but on February 14, Jensen phoned the buyer's agent and said that he intended to block the sale by refusing to sign sale documents. He then offered to sign the documents, but only if the buyer agreed to secretly pay him an extra $50,000 outside the sale and escrow process. The agent refused.

The court approved the pending sale of the house; in response, Jensen filed several motions with the court and the Washington State Court of Appeals. The court of appeals found for Therese and awarded her attorney fees. Jensen still refused to sign the documents

4

and the buyer backed out of the sale. The stress of these events exacerbated Therese's multiple sclerosis symptoms.

A second buyer made an offer on the home and Jensen advised that he would not obstruct this sale. He conveyed the property to Therese by quitclaim deed but misspelled his name on the deed. He then refused to correct this misspelling and threatened litigation against the title company if it closed on the sale. The superior court ordered Jensen to cooperate in the finalization of all sale documents, but he refused and the court sanctioned him. Therese eventually convinced a second title company to close the sale with the existing quitclaim deed, but only after she agreed to indemnify the title company. Jensen then wrote letters to the buyers and their mortgage company claiming that the sale was void and that he might still own the house.

The court eventually concluded that Jensen was a vexatious litigant and required him to post a $10,000 bond before filing any additional pleadings in that court.

### *The Savage Property*

Prior to their marriage dissolution, Jensen and Therese jointly owned stock in Apollo Land Company (Apollo) whose sole asset was a parcel of land in Savage, Minnesota. In 2014, Jensen returned to Minnesota and changed the mailing address for Apollo to his home in Minnesota so that property tax notices were sent there. In May 2014, the Savage property was sold to the State to pay delinquent real property taxes and Jensen and Therese signed an agreement awarding all stock in the business to Jensen. In August,

Jensen registered a new company, the M.J. Scott Company, with the State of Minnesota, and in September, that company purchased the Savage property for $500 or less.

In late September 2014, Jensen filed a signed declaration with the superior court in Washington stating that Therese had lost the property by failing to pay property taxes and that this rendered worthless the Apollo stock that had been transferred to him. He sought $150,000 for the lost value of the company. He did not disclose that the tax delinquency notices were sent to him (not Therese) nor that he had purchased the property for $500 or less. Counsel for Therese discovered these facts and informed the court. The court denied Jensen compensation for the alleged loss of the Savage property.

### *Continued Litigation*

Jensen and Therese owned other property in Minnesota, some with Therese's brother, J.B. During litigation over these properties, Therese and J.B. were each represented by counsel, but Jensen wrote repeated letters and emails to the parties directly, copying their attorneys on the messages. Jensen sent threats to J.B. and Therese, saying J.B. would go to jail and that, if Jensen was disbarred, Therese's alimony would be lowered. He also referred to opposing counsel as "a shill" and "dirtball scum."

Jensen continued to litigate in Minnesota. In April 2015, the district court in Anoka County granted Therese and J.B.'s motion for sanctions against Jensen, finding that he had made misrepresentations of fact and acted in a "vexatious and oppressive manner." In June, it imposed $20,747.50 in sanctions against Jensen. Later that month, the court ordered Jensen to stop contacting opposing parties and found that Jensen had repeatedly brought motions with misrepresentations of fact and little or no basis in law.

*The Washington Disciplinary Proceedings*

The Washington State Bar Association (WSBA) charged Jensen with six counts of violating rules of professional conduct. *Jensen IV*, 430 P.3d at 266. During discovery, Jensen moved to serve interrogatories and document production requests on Therese's attorney so that he could gather evidence of damages Therese suffered and attorneys' fees she had paid. The hearing officer denied this request. Jensen told the disciplinary body that he would not attend the disciplinary hearing—in violation of Washington Rules for the Enforcement of Lawyer Conduct Rule 10.13(b)—but would "save [his] arguing for the appeal to the [Washington] Supreme Court." *Jensen IV*, 430 P.3d at 267.

The hearing officer found that the WSBA proved all six counts by a preponderance of the evidence and found that there were several aggravating factors and no mitigating factors. He recommended disbarment and the WSBA Disciplinary Board unanimously adopted that recommendation. The Supreme Court of Washington agreed and disbarred Jensen. *Jensen IV*, 430 P.3d at 273. The court required, as a condition to be reinstated to the Washington bar, that Jensen pay all judgments owed to J.B., Therese, and the Therese Brown Jensen Trust (the Trust).[1] The Director filed a petition for disciplinary action seeking reciprocal discipline in response to Jensen's disbarment in Washington.

## ANALYSIS

Rule 12(d), RLPR, provides that the Director, upon learning that a lawyer has been publicly disciplined in another jurisdiction, may file a petition for reciprocal disciplinary

---

[1] The record does not explain Jensen's interactions with the Trust and does not include details of any judgments he owes to the Trust.

action in this court. This allows for a more streamlined process by bypassing the hearing process before a Minnesota referee. We may impose discipline identical to that imposed in the other jurisdiction "unless it appears that discipline procedures in the other jurisdiction were unfair, or the imposition of the same discipline would be unjust or substantially different from discipline warranted in Minnesota." Rule 12(d), RLPR. In other words, there are three grounds—aside from our discretion—to not impose reciprocal discipline: unfair proceedings, identical discipline would be unjust, or the discipline warranted in Minnesota would be substantially different than that imposed by the other jurisdiction. Jensen raises all three arguments and we address them in turn.

A.

We will not impose reciprocal discipline if the proceedings in the other jurisdiction were unfair. *See, e.g.*, *In re Koss*, 572 N.W.2d 276, 278 (Minn. 1997) (refusing to impose reciprocal discipline where the other jurisdiction imposed discipline without a hearing and without considering mitigating circumstances). A jurisdiction's disciplinary procedures are fair if they are consistent with the principles of fundamental fairness and due process. *Wolff*, 810 N.W.2d at 316. To determine the fairness of disciplinary proceedings in another jurisdiction, "we review the underlying record to see if the attorney received notice of the proceedings and the allegations against him, and had the opportunity to respond to those

8

allegations and offer evidence of mitigating circumstances." *In re Overboe*, 867 N.W.2d 482, 486 (Minn. 2015).

Jensen offers two reasons that the Washington disciplinary proceedings were unfair.[2]  Both fail.  First, Jensen argues that he was unfairly denied the opportunity to serve interrogatories on a third party to learn of "damages that were being suffered by" Therese and fees she had paid to her attorney.  This information is not relevant to Jensen's conduct or to mitigating or aggravating circumstances and he admitted as much at oral argument. Because he was not prejudiced by lack of that discovery, his first unfairness argument fails. *See Overboe*, 867 N.W.2d at 486 (noting that a delay in North Dakota's disciplinary proceedings did not "destroy the fundamental fairness of the entire process" because the attorney failed to prove he was prejudiced by the delay).

Second, Jensen argues that he was denied access to privileged information in his WSBA disciplinary file.  The Washington Supreme Court rejected this contention because there was no record support for his claim that he was not allowed to access the file.[3] *Jensen IV*, 430 P.3d at 272.  Jensen could have testified at his hearing to create such a

---

[2]    Jensen raises a related argument, asserting that his former brother-in-law, J.B., has been exercising a nefarious influence over courts in Minnesota and in Washington.  Jensen claims that "[s]omething was wrong with the court[s]" because they "uniformly always rule for" J.B. and claims that the Washington disbarment order was actually written by J.B. We do not credit these arguments because they lack record support.

[3]    In fact, the court order that Jensen submitted with his supplemental brief stated that "Disciplinary Counsel has already provided substantial documentation and discovery to [Jensen] . . . in excess of 1000 pages."

record but he willfully chose not to attend. Because this argument lacks record support, it fails. *See Lindgren v. City of Crystal*, 204 N.W.2d 444, 446 (Minn. 1973).

B.

Jensen next argues that it would be unjust to impose reciprocal discipline because "all of the facts relative to this matter occurred almost 10 years ago . . . and [he] is no longer under the pressure of sending four children to college while caring for a profoundly handicapped wife." His first argument—that reciprocal discipline is inappropriate because of the passage of time—is unpersuasive. The fact that reciprocal discipline is imposed long after the misconduct does not render the discipline "unjust" unless the lawyer can identify specific prejudice related to the delay. *In re Sklar*, 929 N.W.2d 384, 390 (Minn. 2019). No such prejudice has been identified here.[4]

Jensen's second argument—that the facts that led to his misconduct have changed—is similarly unpersuasive. In *In re Otis*, 582 N.W.2d 561 (Minn. 1998), we held that imposition of reciprocal discipline would be unjust because, by the time reciprocal discipline was sought, the underlying cause of the misconduct had been addressed.[5] In that case, a lawyer licensed in New Hampshire and Minnesota was disbarred by the New

---

[4] Moreover, much of this time elapsed because Jensen was disbarred in Washington in 2018 and the Director only learned of this disbarment in 2023. Jensen should not be allowed to benefit from his failure to notify OLPR of discipline in another jurisdiction. *Cf. Sklar*, 929 N.W.2d at 390 (rejecting an attorney's argument that a 10-year delay in imposing reciprocal discipline was unjust where the delay was largely "because of [the lawyer's] own appeals").

[5] Changed factual circumstances may not be the only grounds for considering disciplinary proceedings "unjust," but it is the only argument (aside from length of time elapsed) raised by Jensen.

10

Hampshire Supreme Court for improper sexual behavior toward clients. *Id.* at 561–62. Four years later, the Director learned of the disbarment and sought reciprocal discipline under Rule 12(d), RLPR. *Otis*, 582 N.W.2d at 562, 563. Otis introduced evidence that his sexual behavior was the result of a seizure disorder, that he sought medical help for the seizure disorder, and that he had the seizure disorder under control through medication. *Id.* at 562, 564. He had not committed any similar conduct after getting the seizure disorder under control, but the New Hampshire disciplinary proceeding occurred too early in his treatment for the effects of the medication on his behavior to fully manifest. *Id.* at 564.

We observed that Otis had expressed remorse and that "at this time disbarment is not necessary to protect the public." *Id.* at 565. We held that reciprocal discipline of disbarment would be unjust and instead imposed a five-year suspension. *Id.* Under *Otis*, then, imposing the same discipline in Minnesota that was imposed in another jurisdiction may be "unjust" under Rule 12(d), RLPR, if the lawyer shows that the circumstances that caused the misconduct have changed (especially if evidence of the change was not available in the earlier disciplinary proceeding) and the discipline imposed in the other jurisdiction is no longer necessary to protect the public.

In this case, however, there is no evidence that the underlying causes of Jensen's misconduct have changed. Jensen suggests that his previous misconduct was due in part to the stress of "sending four children to college while caring for a profoundly handicapped wife." This argument fails for two reasons. First, it would be inappropriate to excuse Jensen's obstructionist behavior during dissolution proceedings against his severely handicapped wife because he was "caring for" her. Second, the stress of caring for loved

11

ones was not the cause of Jensen's misconduct. Jensen was not disciplined for missed hearings or filing deadlines—things that *might* be excusable if an attorney's home life became chaotic. Rather, his misconduct involved disobeying court orders, lying to a tribunal, and engaging in frivolous and vexatious litigation—all things that he was sanctioned for when he practiced law in Minnesota in the 1990s. In other words, Jensen does not address the root cause of his misconduct: his own inability to follow court orders and assume responsibility for his actions. As a result, it would not be unjust to impose reciprocal discipline.

## C.

Jensen lastly argues that we would impose "substantially different" discipline for this misconduct in original disciplinary proceedings in Minnesota. He argues that we would not impose *any* discipline for his misconduct because (1) he was within his rights to block the sale of the Mukilteo house, and (2) his conduct did not involve representation of a client. In addition, he argues that, even if we would impose some discipline for his misconduct, we would not disbar him. We address these arguments in turn.

## 1.

Jensen argues that his obstructionist behavior during the divorce was acceptable because he "had every right to refuse to give away his property." But crucially, attorneys have an ethical obligation to obey court orders.[6] When Jensen disagreed with a trial court

---

[6]     Jensen does not explicitly raise the argument before us, but the Washington court construed his argument as one that his actions were justified by a "good faith" belief that the law was on his side. Minnesota has a similar rule based on good faith. Minn. R. Prof. Conduct 8.4 cmt. 8 ("A lawyer may refuse to comply with an obligation imposed by law

order, he was entitled to appeal—an option he exercised at great length. But once a court has adjudicated a dispute and appeals have been exhausted, attorneys are expected to abide by the result. Attorneys, as officers of the court, have special obligations to conduct themselves with candor before courts and obey court orders. Simply put, Jensen was required to obey court orders and willfully failed to do so.

2.

Jensen also argues that reciprocal discipline is not warranted because his misconduct did not involve representation of a client.[7] In fact, we have meted out considerable discipline against attorneys even for misconduct not involving clients. *See, e.g.*, *In re Ulanowski*, 800 N.W.2d 785, 797, 804 (Minn. 2011) (suspending a lawyer for one year as a result of misconduct including disobeying court rules and filing frivolous motions in his own divorce proceeding); *In re Crabtree*, 916 N.W.2d 869, 870 (Minn. 2018) (order)

---

upon a good faith belief that no valid obligation exists."). Jensen cannot avoid the consequences for his misconduct by asserting a good-faith defense, however, where he has continually failed "to acknowledge directly on-point contrary authorities, even after courts have brought them to his attention." *Jensen IV*, 430 P.3d at 269; *see also In re Stanbury*, 561 N.W.2d 507, 511 (Minn. 1997) (holding that an attorney who had failed to pay debts could not avail himself of the good-faith defense "[a]fter final judgment and exhaustion of his legal appeals"), *reinstatement granted*, 562 N.W.2d 685 (Minn. 1997).

[7]     Similarly, Jensen claims that "[n]o client has ever complained about [him] in any court, nor has [he] ever been accused of taking any money, of neglecting a client, or of any other misconduct involving a client." This is false. His previous reprimand and suspension were the result of misconduct involving clients, including mishandling client funds. *See generally Jensen I*, 468 N.W.2d 541; *Jensen III*, 542 N.W.2d 627.

(suspending an attorney for nine months because of, among other things, misleading conduct in his personal bankruptcy proceeding).

Notably, we have also disbarred attorneys whose misconduct arose solely in situations where the lawyers represented themselves. *See In re Graham*, 503 N.W.2d 476, 478, 480 (Minn. 1993) (disbarring an attorney for failure to file income taxes, filing a fabricated document in his own marriage dissolution proceeding, and providing false testimony and fabricated documents in his personal bankruptcy); *In re Hansmeier*, 942 N.W.2d 167, 169, 175 (Minn. 2020) (disbarring an attorney for fraudulent conduct during his personal bankruptcy proceedings). In sum, the fact that no client was harmed does not allow an attorney to escape discipline; even an attorney representing himself is capable of inflicting great harm on the legal profession and the broader public.

3.

Having determined that we would impose *some* discipline for Jensen's conduct, we now consider whether discipline *substantially different* than that imposed by the Washington Supreme Court is warranted in Minnesota. Reciprocal discipline is inappropriate if "substantially different" discipline is warranted in Minnesota for the misconduct at issue. Rule 12(d), RLPR. This does not mean that we may only impose reciprocal discipline if we would impose discipline identical to that imposed in the other jurisdiction. *See Overboe*, 867 N.W.2d at 487 (noting that the question is "not whether we might have imposed different discipline had [the lawyer's] disciplinary proceedings originated in Minnesota, but rather whether the discipline imposed by [the other jurisdiction] is unjust or substantially different from discipline warranted in Minnesota")

14

(citation omitted) (internal quotation marks omitted); *Wolff*, 810 N.W.2d at 317 (noting that reciprocal discipline is appropriate "only if *similar* discipline would be warranted in Minnesota" (emphasis added)).  Rather, the word "substantial" must carry some meaning.  Thus, Jensen must show not only that disbarment is outside the range of discipline we would impose, but that it is substantially so.

The goal of discipline is "not to punish the attorney, but rather to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys."  *In re Albrecht*, 779 N.W.2d 530, 540 (Minn. 2010) (citation omitted) (internal quotation marks omitted).  In determining proper discipline, we consider the nature of the misconduct, the cumulative weight of the disciplinary violations, the harm to the public, harm to the legal profession, and aggravating and mitigating factors.  *In re McCloud*, 998 N.W.2d 760, 766–67 (Minn. 2023).

"[W]illful disobedience [of] a single court order may alone justify disbarment."  *Sklar*, 929 N.W.2d at 389 (quoting *In re Daly*, 189 N.W.2d 176, 181 (Minn. 1971)), *reinstatement granted*, 932 N.W.2d 10 (Minn. 2019).  In addition, "[m]aking false statements is misconduct of the highest order and warrants severe discipline."  *In re Hawkins*, 834 N.W.2d 663, 670 (Minn. 2013) (citation omitted) (internal quotation marks omitted).  This is because, as we emphasized in Jensen's previous disciplinary proceedings, candor to the courts is necessary for our system of justice, and when a lawyer lacks that "truthfulness and candor . . . courts do not hesitate to impose severe discipline."  *Jensen III*, 542 N.W.2d at 634 (citation omitted).

Disbarment is not "substantially different" from the punishment we impose for misconduct like Jensen's.[8] Three cases illustrate this. In *Graham*, 503 N.W.2d at 478–79, the lawyer had a limited disciplinary history (two admonitions) and his misconduct did not involve a client—it involved his personal divorce, personal bankruptcy, and failure to file income taxes. The lawyer's misconduct included providing false testimony and fabricated

---

[8] One count of Jensen's misconduct in Washington was for contacting represented persons. Minnesota Rule of Professional Conduct 4.2 provides that "*[i]n representing a client*, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter . . . ." (Emphasis added.) And comment 4 to the rule states that "[p]arties to a matter may communicate directly with each other." *Id.*, at cmt 4.

Several jurisdictions have interpreted the same language to mean that the no-contact rule applies to self-represented attorneys. *See In re Haley*, 126 P.3d 1262, 1269 (Wash. 2006); *Matter of Steele*, 181 N.E.3d 976, 980 (Ind. 2022) (collecting cases); *but see In re Benson*, 69 P.3d 544, 548 (Kan. 2003). This accords with a 2022 advisory opinion from the American Bar Association. *See* ABA Comm. on Ethics & Pro. Resp., Formal Op. 22-502 (2022) (recommending that the no-contact rule should apply to self-represented attorneys). We have not addressed whether the no-contact rule applies to *self-represented* attorneys.

We do not need to decide this issue today. For the contacts connected to litigation in Washington, we apply Washington law. *See* Minn. R. Prof. Conduct 8.5(b)(1). Under Washington law, a self-represented lawyer violates Rule 4.2 by contacting a represented party, *Haley*, 126 P.3d at 1269, so we accept that a violation of the rule occurred. Our only consideration, then, is the discipline we would impose for conduct that would constitute a violation of Rule 4.2 in Minnesota (for instance, a lawyer representing a client who communicated with a represented party). We have issued private admonitions, public reprimands, and suspensions up to 60 days for such conduct. *See In re Charges of Unprofessional Conduct in Panel File No. 41755*, 912 N.W.2d 224, 233 (Minn. 2018) (private admonition); *In re Wilson*, 746 N.W.2d 643, 644 (Minn. 2008) (public reprimand for communicating about the subject of representation in one case with a person the respondent knew to be represented by the public defender's office in another case); *In re McCormick*, 819 N.W.2d 442, 443, 445 (Minn. 2012) (60-day suspension for instructing investigator to interview anticipated witness without obtaining permission from witness's attorney), *reinstatement granted*, 822 N.W.2d 646 (Minn. 2012). Of course, this violation must be considered with all the other misconduct Jensen committed in assessing whether disbarment is substantially different than the discipline warranted in Minnesota.

16

documents to multiple courts. We disbarred him because of his extensive pattern of dishonesty and deceit. *Id.* at 479–80. Jensen's misconduct is slightly different—it includes failure to obey court orders and frivolous litigation, rather than fabricating documents—but both cases have at their core a lack of respect for the courts and a pattern of intentional dishonesty in a lawyer's personal matters.

Our decision in *Ulanowski*, 800 N.W.2d at 797, involved a wider array of misconduct, some in representing clients and some involving the lawyer's personal divorce. That lawyer, like Jensen, made misrepresentations to the court, filed frivolous claims, violated court rules, and harassed opposing counsel. Unlike Jensen, that lawyer also improperly threatened criminal prosecution, improperly withdrew representation, failed to communicate settlement offers to clients, and failed to cooperate in the discipline proceedings. Like Graham, Ulanowski had a minimal disciplinary history (one prior admonition). Ulanowski was disbarred. Although Ulanowski engaged in a wider array of misconduct, similar discipline is potentially warranted because, as discussed below, Jensen has a more extensive disciplinary history, including essentially identical misconduct.

Finally, our opinion in *Hansmeier*, 942 N.W.2d 167, is instructive. In *Hansmeier*, the attorney was disbarred for engaging in fraud in his personal bankruptcy. We found especially troubling the fact that—like Jensen in this case—Hansmeier had previously been suspended for making false statements to tribunals and abusing the legal process for personal gain.

Not only is Jensen's misconduct similar to these three cases, but his consistent disciplinary history and lack of remorse are problematic aggravating circumstances. We

17

look to disciplinary history in part to determine whether the public is likely to be put at risk if an attorney is allowed to continue practicing law. *See McCloud*, 998 N.W.2d at 769. Our concern about the risk to the public is significantly greater "when the lawyer engages in the same type of misconduct for which he has been previously disciplined." *Id.* And while "lack of remorse" should not aggravate discipline when the attorney is merely asserting a good-faith defense, that is not the case here. Jensen's refusal to accept any responsibility for his actions—whether motivated by ignorance or malice—suggests that he would pose a risk to the public if allowed to practice law.

Accordingly, we conclude that disbarment is not substantially different from the discipline that is warranted in Minnesota for Jensen's conduct.

## CONCLUSION

We hold that reciprocal discipline is appropriate. We order that, upon the filing of this opinion, R. James Jensen, Jr. is disbarred from the practice of law in the State of Minnesota. Jensen must comply with Rule 26, RLPR (requiring notice to clients, opposing counsel, and tribunals), and must pay to the Director the sum of $900 in costs and disbursements pursuant to Rule 24, RLPR. Consistent with the discipline imposed by the Washington Supreme Court, Jensen will not be eligible for reinstatement to the practice of law in Minnesota until he has paid all judgments owed by him to Therese, J.B., and the Trust.

Disbarred.

GAÏTAS, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.